5100222. Counsel, please. Thank you, Mayor. Please, the Court, Counsel. My name is Greg Keltner and I'm here on behalf of Dodge Moving and Storage. The question before the Court this morning is whether the Commission's decision was against the manifest way to the evidence. Counsel, can I stop you before you get to your question? Sure. I want to understand something here. The arbitrator found that the claimant's current condition was unrelated to the accident of October 20th and temporary total disability, granted temporary total disability through January 27, 1997, but did not grant any total disability thereafter and gave him medical bills totaling $62,626, found him 40% permanently partially disabled and found that he was not entitled to a wage differential. Is that correct? Correct. The Commission affirmed that. Is that not correct? That's correct. But the Circuit Court found that that was against the manifest way to the evidence, remanded it back to the Commission, awarded TTD for a longer period of time, remanded it back to the Commission for consideration of whether the claimant was entitled to benefits for wage differential or for increasing his PPD benefits. Is that correct? That's correct. So where's our jurisdiction? Your Honor, that is a, I assume what you're getting at is whether this is an interlocutory appeal. Sure, it's an interlocutory appeal. I wrestled with it again a month and a half ago when Judge Justice Stewart spoke at a seminar I was at, but in the final analysis what it came down to was under the Williams v. Industrial Commission case, if the remand is for the Commission to enter a decision in accord with what the Circuit Court has said or to conduct proceedings that are on incidental matters or to conduct a mathematical calculation, then that's a final order. Whereas if it's to conduct some additional proceedings involving questions of law or fact, it's interlocutory. And in my view, Your Honor, all the evidence that would be necessary to comply with the Circuit Court's decision to determine whether there was a wage differential or an increased permanent partial disability, that information was in the record. That's not the test. Would not require additional... But that's not the test. The test is whether they have to do something other than a simple mathematical calculation. And they've been remanded to do something more than a simple mathematical calculation, and that is to determine whether he's entitled to a wage differential or an increase in PPD benefits. Now, that's not a simple mathematical calculation. No, but it is something that would be incidental to what's already been decided by the Circuit Court. All of them are incidental to what's already been decided by the Circuit Court when they're remanded to the Commission. They're all incidental when the Court reverses and sends it back for them to make a determination. I don't see how you can make an argument that this isn't A.O. Smith personified. But under the Williams case, it is an incidental matter, so it does... It is a final decision as opposed to interlocutory. No. They've got to do something other than a mathematical calculation. I don't see how we have jurisdiction to entertain the appeal of the law. May I proceed? Are there other questions? You might as well. Since you're here, yes. Thank you. The question, of course, is whether they... Once we get past the jurisdictional questions, whether the Commission's decision was against the manifest way of the evidence and whether the Circuit Court was in there in reversing the unanimous Commission decision, there are essentially three components of evidence that support what the Commission did. The first is the activity, what occurred after Dr. Haupt's full-duty release of the petitioner on April 16, 1996. At that point, the petitioner was given a full-duty release and his only complaint to Dr. Haupt at that time was some mild weakness in his knee. He returned to Dr. Haupt in October of 1996 and complained of somedial joint line pain. Dr. Haupt asked him, and he also told Dr. Haupt, that he had some increased pain over the preceding one and a half months. Dr. Haupt understandably asked him if there was another injury, and according to Dr. Haupt's note, there was no indication that there had been another injury. Mr. Rensing came back to Dr. Haupt a month later. The symptoms were essentially the same, perhaps a bit worse. And again, Dr. Haupt asks him, has there been another injury, and the claimant indicates that it's not. At some point after this, the surgery gets scheduled, and then the petitioner comes back to Dr. Haupt again on December 31, 1996, and Dr. Haupt for a third time asks him whether there's been a new injury. And at this point, the petitioner tells him, I was doing well until July of 1996. I got out of a truck and I had an immediate onset of pain in my knee which resolved, but I continued to have problems thereafter which got worse over time. The petitioner didn't testify that Dr. Haupt had recited the history wrong, didn't indicate that there wasn't an episode that happened to him in July of 1996. So the commission could very well look at that and conclude, we have an intervening accident here. We clearly have an episode that happened that caused a change in whatever symptoms he might have been having. I know the claimant's version is that I was having ongoing knee pain subsequent to my second surgery. But by Dr. Haupt's records, the petitioner told him he was doing well until he had this episode in July of 1996, and his symptoms got worse. Did the commission find that that incident was the cause of the pain? There wasn't a specific finding of that. That was incorporated. They essentially adopted the arbitrator's decision. And in her decision, she went through a litany of the facts that she relied upon to conclude that the petitioner's current condition of ill-being was not related to the October 1995 accident. If that's what was relied on, why were medical expenses awarded for surgery in 1997? It's not in the record. I can imagine what happened. I can offer you some speculation if you're interested in hearing that. There's an inconsistency there. Do you agree with that? I agree that if you looked at it on its face, you would say, why in the world are they contesting causation when they authorized the surgery and when they agreed to pick up the TTD? Part of it, quite honestly... Well, it's not that the commission awarded it anyway, right? Yeah. There was not a dispute about it. It had been authorized. It had been paid. And at the time, the surgery was authorized. Because the issue about whether there had been another accident, that was never clarified until four days before the surgery was to take place. And the appointment where this issue came up was, at that point, the surgery had already been approved. There had been two prior visits with Dr. Haupt where he specifically asked the claimant about another injury. And the claimant indicated that there was no other  And the date that this comes out is on December 31st, New Year's Eve. You have New Year's Day and then the day between that and then the surgery date. Quite frankly, it's the sort of record that if the adjuster had seen it before the surgery, it probably would have triggered an IME. But you're absolutely correct. It was accepted. There was no issue about it at the time. Well, I guess that doesn't explain why the arbitrator awarded those medical expenses. I mean, were they stipulated to? Was payment for that stipulated? It had been paid. It had been authorized. The TGD had been paid. And at that point, in terms of responsibility for it, my client was not interested in trying to recoup that money. And so they just let it go, basically, was the position that they took. So there's some interesting nuances here in this case that you've alluded to in addition to the interesting nuance of jurisdiction. But looking at the substance of the evidence, I mean, you're saying this is sort of a battle. It comes down to the opinions, the conflicting opinions of Lehman and Dr. Mateva, right? That's right. Mateva gave a causal opinion, as I read the record, in support of the claiming, saying there was a causal connection between his condition of ill-being and a work incident. Lehman says the opposite. So this is really up to the commission to weigh the sufficiency of the evidence and the conflicting medical opinions. Is that sort of what you're saying here? I think that's exactly what I'm saying. That's exactly what went on here. I mean, even, quite candidly, even if you look at Dr. Lehman's deposition testimony, I mean, I think I counted two times on direct examination where he says everything after the second surgery is unrelated to the 1995 accident. On cross-examination, initially with Mr. Boyne, he says on two occasions, pages 778 through 780, it's not related to the accident. And then the very last question before the deposition ends from Mr. Boyne is about the causal relationship, and Dr. Lehman seems to indicate that, yeah, maybe there was. So, I mean, the commission had to sort through Dr. Lehman's testimony and, I guess, figure out, you know, is four denials greater than, you know, one quick admission at the end of the deposition? You know, frankly, I wasn't there when it happened. I'd have preferred it not have gone that way. But, I mean, that's what they were confronted with. And I think, Justice Hudson, you've hit the nail on the head about what went on here. I mean, because if you look at what Dr. Metavis said, I mean, there are reasons that the commission could have decided not to rely on him. Number one is he didn't look at any medical records other than those that were generated in conjunction with his own treatment. He looked at the MRI, I think, from April of 2001. But that was pretty much it. And his assumption, too, was that Mr. Rensing had had, except for maybe a brief period here or there, had had unrelenting knee problems since the accident. And if you look at the medical records, I mean, that doesn't appear to be the case. I was talking earlier about what was in Dr. Halp's record from December of 1996. But, you know, then we've got this other big issue of when Dr. Halp ultimately releases him at full duty in February of 1997, and then again in August of 1997. You've got almost three and a half years where there's no medical treatment at all. And more specifically, there's no documentation regarding knee problems. And when you look at Dr. Garces' records, who's the primary care physician, Mr. Rensing established treatment with Dr. Garces, and I think it was 19, I'm sorry, in September or so of 2000, maybe a little bit earlier than that, 1999, I think. Anyway, when Mr. Rensing sees Dr. Garces in September of 2000, he tells him I've had low back pain for a year. There's no mention of the knee problem. Then when he sees Dr. Garces again on December 19th of 2000, he says, I have, Dr. Garces doesn't indicate, a two-month history of knee pain. Now, what's not in that record, I think, is just as significant as what is in that record. And what isn't in that record is a three and a half year period of problems with that knee. We know from the September 1st visit that Mr. Rensing certainly could communicate if he'd been having long-term problems. He did it on September 1st with regard to his back. If he was having knee problems on September 1st of 2000, why in the world didn't he tell Dr. Garces then, or more significantly, on December the 19th, when we're at three and a half years from MMI date, why didn't he say I've had continuing problems all along? I don't know. There was no testimony from the petitioner that Dr. Garces had gotten it wrong in terms of recording the history that was provided to him by the petitioner. So certainly a reasonable inference that the Commission could have drawn was something happened two months prior to December 19th, 2000, to cause this man's problems to flare up. And the fact that he said nothing about ongoing problems could have led the Commission to conclude that the problem was unrelated to the initial work injury. We've already kind of talked about how the Commission had to sort through the medical testimony, so I won't go through that. The bottom line here really is it's a question of is there evidence to support what the Commission did here. And I will grant you that if you put three different commissioners in the seats of the people who decided this, you could have them maybe come to a different conclusion. Three other people could perhaps reach the same conclusion that the three commissioners arrived at here. There isn't evidence here, there isn't such a lack of evidence that another tribunal would be compelled to reach an opposite result. So in the final analysis, we're simply asking that the Commission's decision be affirmed, be reinstated, and that the Circuit Court's decision be vacated. Are there any questions? Thank you, Counsel. Counsel, please. Good morning, Honorable Justices, Counsel. My name is Kevin Boyne. I'm an attorney for Bruce Rensing. Counsel, I think Justice Hoffman's position is well taken regarding jurisdiction. What's your position on whether or not we have jurisdiction? I believe we do. I believe the Court made a final decision, entered judgment for the people, and I think going back and making the decision, the items are already in the record. It's an ancillary proceeding to make the determination. So they don't have to do anything but a mathematical computation? No, obviously they have to do more than a mathematical computation. Well, what does A.O. Smith say? If they have to do more than a mathematical computation, it's an interlocutory order, not appeal. It should be appealed after the Commission does its work. And that's what Smith says. Andy, but you never filed any motions challenging jurisdiction. No, I did not. You realize, though, you can't, by agreement, confer jurisdiction on us. It either exists or it doesn't. Yes. Okay. This is a case in which the Commission made very specific findings, and also made very specific findings of facts and specific conclusions of law. In this case, the Commission found that prior to this original injury of October 1995, the petitioner had no prior knee problems. There's no dispute that the first two surgeries that occurred, the first one by Dr. The first doctor and the second one by Dr. Hopped are related. The only dispute arrived later regarding the third surgery. But if you look at the dispute and the findings of the Court, I'm sorry, the findings of the arbitrator that were adopted by the Commission, the arbitrator makes specific findings in which he addresses the issue of the July 1996 incident. But if you also look at the other findings, the arbitrator makes a specific finding that with regard to the third surgery, which was held July on January 3rd of 1997, that the petitioner was temporarily totally disabled from January 3rd, 1997 through January 27th, 1997. Now, if the petitioner is temporarily totally disabled during that period, that means that the third surgery is causally related. Otherwise, you wouldn't have a period of determination that the petitioner did not reach, the petitioner's injury did not stabilize until late 1997, which would also put the first three surgeries as all being causally related. Now, the first three surgeries were done and they removed the medial meniscus from the petitioner's knee. The last two surgeries and the medical dispute is a meniscal transplant, which was performed to replace the meniscus that was removed in the first three surgeries. Now, if the first three surgeries are related, and that's what removed the meniscus, I don't see any way that the last two surgeries that were done to replace that would not also be causally related. What was the last surgery? What was the date of the last surgery? The fifth surgery? Right. That was September 2002. All right. The arbitrator found that his current condition of ill being was unrelated to the October 20th, 1995 work injury, correct? Correct. With regard to the conflict between the doctors, obviously you're arguing that Dr. Mataeva's opinion was more accurate, right? Yes, but Dr. Mataeva and Dr. Lehman had the same opinion, and they both stated in their deposition the same opinion, that the last two surgeries to replace the meniscus were done to replace the meniscus removed in the first three surgeries. So, on that, they did agree, and that's the only thing on the record with regard to that. All right. So, he then sees Dr. Garces in, when did he first see Garces, 2000? Yes. You've got something here that doesn't really hinge on the doctor's opinions, do you? You have a fact which was cited. There was a gap of almost two and a half years in which he didn't seek any type of treatment. And he testified to that. He said that basically he was told that there's nothing else we can do, you know, you're as good as you're going to get, and he went about his business. When he saw Garces, when you see that record in December of 2000 when he saw Garces and mentioned his knee, he was there for toenail fungus. Garces is his primary care physician, and he mentions to him while he's there for something else, oh, I also have this knee problem. Now, if you read the record, it does say knee pain, two months duration, but it also says severe osteoarthritis of the right knee, which that can't develop over two months, and it also, in another place in the record, mentions prior, the prior medical surgery, prior surgery on the knee. So there must have been some discussion about, the record shows there had to be some discussion or disclosure that, hey, I had this prior knee injury, and I've got, you know, these long-term problems with my knee, and the, what the petitioner testified is that it got worse, you know, it was worse at that time, but he had the problem all along, and certainly the entry of severe osteoarthritis would. Well, the commission found that it stabilized by late 1997. You're arguing he had the problem all along, and yet, admittedly, he didn't seek any kind of further treatment for two and a half years, right? There's a gap there. There is a gap, but there's also a factual basis that this, you know, just a gap in treatment alone will not eliminate the causal connection, okay? I think that's Montgomery Elevator case, where there was, an individual was injured in 1997, missed two days of work, and didn't seek medical treatment. I cite the Montgomery Elevator case in my brief, didn't seek treatment for any treatment, medical treatment, until 2009, two years later, and that was found, in that case, the arbitrator denied the claim, and the commission adopted the arbitrator, but the appellate court reversed it and found that there was a causal connection. So I don't think the gap in treatment alone is sufficient, especially when you have a case here where the facts are, this guy had all the meniscus removed from his knee on surgeries that are causal related, and then later in life, the knee is going to, he's going to be living with this later in life, which is only actually a few years later when he went back, and he has to have surgeries to replace that meniscus. I don't see how there can't be a causal connection if the surgeries that remove the meniscus are related and the subsequent surgery replaces that meniscus later. So I think that the causal connection is there. I think that the arbitrator also found in her specific findings that she agreed with Dr. Hoppe, and Dr. Hoppe's entry in December of 96 specifically says this is not a new injury with regard to the surgery that's about to occur, that this is merely an aggravation of the original injury from October 1995. And that basically follows the Vogel case, which I cited in my brief. In Vogel, an individual was injured at work, wasn't disputed on the initial injury, injured his neck, had neck surgery that was done, and was improving, and then he had a motor vehicle accident. And he said, he tested, in that case the petitioner testified that, hey, before the motor vehicle accident I was doing good, I didn't have any pain, I wasn't having any problems, everything was going great. After the motor vehicle accident he gets recurrent problems and recurrent symptoms in the neck and recurrent problems down the arm. Then he has a second and third motor vehicle accident, all these motor vehicle accidents unrelated to work, and then has to have another surgery. The arbitrator found in that case that it wasn't related, the appellate court found that the decision of the commission was against the manifest weight of the evidence, because the commission specifically found that it was an aggravation, that there was nothing in the record that said that there was a break in the chain of causal connection. Now that's exactly this case, there's nothing in the record that says there's a break in causal connection. The arbitrator specifically finds that there's an aggravation of the pre-existing condition, and that's why she doesn't award benefits. Vogel and Vogel, they specifically cited that. They said, wait, the commission here didn't say that there was a break in causal connection, the commission really said there was an aggravation of the pre-existing condition, and that doesn't break the causal connection, which is, that's exactly the case we have here. Is that what you argued in front of the commission? This was an aggravation case? No, I argued that this is causally related. I argued that there's nothing that breaks the chain of causal connection, which there isn't, because it doesn't have to be the only causal, it just has to be a causal connection. And for those reasons, I believe, I think it's clear from the record here that this is related, it is against the manifest weight of the evidence, and I think this follows Vogel right on point. I think you should, just as in Vogel, where they agreed that the commission, that the decision of the commission was against the manifest weight of the evidence, I think here the decision of the commission is against the manifest weight of the evidence. And we ignore the jurisdiction? I'm not suggesting you ignore it, I just argue that there was. If you disagree, then... Well, you were asking for a weight differential. Yes. And you were denied that. Yes. And now it's been sent back by the circuit court for a determination of weight differential. Right, in light of the fact that the... Well, okay, let's say that they decide not to award a weight differential. Are you going to see this case again? I... Well, that's the whole idea, as a formality. Okay. Thank you, thank you. Rebuttal? Thank you. The Vogel case really isn't similar to what we have here, because in Vogel, the petitioner had a back injury and had not reached MMI when he was involved in the vehicular accident, and it was specifically found in that case that one, because he ended up developing a pseudo-arthrosis, and the evidence was that that's one of the risks that you run when you have this type of surgery, that you might get a pseudo-arthrosis. So the auto accident that didn't break the causal connection in that case was a situation where the claimant wasn't at MMI yet. As far as Dr. Garces' records were concerned, I mean, again, what's in there in that December 19, 2000 note, the commission had to sort through that and decide what they were going to find appropriate or find believable and what they weren't going to find credible. So again, that's a decision that they had to make. You don't have any further to say about the question of jurisdiction? Not beyond what I said earlier, Your Honor, no. Well, do you think this is an appropriate wage differential case? No, I don't. I think... No one's awarded. Are we going to see this again? I suppose it's a very good possibility. And I guess the one thing I would say about the jurisdictional issue that I sort of alluded to when it came up initially, because I did wrestle with that, I did not want to find out two years from now when it came up here, well, Mr. Keltner, you've waived this and we're not going to talk about that. So I opted to err on the side of caution. But since you asked me about it being a wage differential case, I mean, under the Durfee v. Old Bend case, no, I don't think it would be appropriate for a wage differential. Thank you. Thank you, counsel. The court will take the matter under revised.